All right, 1632A v. PQ Corporation v. Lexington Insurance. It please the court, my name is Joseph Ellis and I'm here on behalf of the Lexington Insurance Company. And could you speak up please? PQ Corporation. PQ Corporation, sorry. Yeah, just a little. Okay. We reserve five minutes for rebuttal if that's still okay. Okay, you watch your white light and so will she. Okay. This case is about an insurance recovery, the wrongful denial of coverage by Lexington Insurance against Double D Warehouse. The case has come to this court because Double D was exposed to a loss that would have put them out of business and made a settlement with PQ Corporation, who was the party that stored their goods at the warehouse. Are the terms of that settlement in the record? I don't recall. I think that it's just the judgment from the consent decree in LaSalle. So you don't know how much money changed hands? I can tell the court no money changed hands. Okay. You are going to have to speak a little better. I know you're soft-spoken. Yes. I really understand. I have a husband who's very soft-spoken. But you're going to have to help us. Okay. I can do that. You know, a bill of lading, of course, is a document between shippers and the company or person requiring the shipping. How can such a document be considered to be a warehouse receipt, exchanged between a storage facility and the company storing goods? Well, I think that the extrinsic evidence helps explain that. The bill of lading and the process by which Double D accepted goods had changed over the years, and it no longer used warehouse receipts. So the bill of lading and its electronic online inventory system became effectively its warehouse management receipt. So I think the point that we were making that seemed to be missed by the district court was that by indicating on their application that they no longer used warehouse receipts, and whether it's inartfully or ambiguously noted, they did indicate that they used bills of lading for the warehouse receipt. And so it's your position they were able to make that unilateral change, and there's no problem with that? I believe that, accompanied with the broker's understanding of the business practices and that the custom and practice in the warehouse industry is that they no longer use warehouse receipts and that this custom and practice went on for many years. Do we have evidence about the broader usages of the trade having abandoned warehouse receipts? Through the testimony of Mr. Olson, the manager of the warehouse, he indicated that he had 365 other clients that he delivered goods to through Double D Express, and that not one of those customers used the warehouse receipt. Now, Section 1 states that Lexington will pay obligations for damage where and I'm going to quote, a warehouse receipt or storage agreement that is issued by you or on your behalf, end quote. And Section Roman numeral 24A says that the loss will not be covered without a, quote, signed warehouse receipt from the customer. Now, you are claiming that this creates an ambiguity. I have two questions. First, did you raise this below? And second, doesn't it simply require that Double D issue a warehouse receipt and the property owner sign it? Well, we definitely raised this below, and especially every argument started with the insuring agreement, the clause referencing this section, and that we believe that there's an ambiguity in interpreting the subsequent Section 24A. And the district court, even in their analysis, starts with that and then completely ignores it and doesn't try and reconcile the difference between allowing a Double D to issue a warehouse receipt or somebody on their behalf. And so if we were looking at the bill of lading, which was issued by PQ, and it was the effective equivalent of a warehouse receipt, it would fall under that language. Were the bills of lading signed by PQ? Yes, they were. They're countersigned, so they're signed by Double D Express, signed by PQ, and then ultimately signed off by Double D Warehouse when they receive it. And did Double D issue warehouse receipts to any of its customers? They do not. Did they? They do not. Did they? Not in the 10-year window that Mr. Olson's been operating the warehouse. Why not? I mean, why not? What constituted the agreement for service between the parties? In other words, how did PQ know, for example, how much to pay each month or each year? They had a series of emails back and forth with Double D Warehouse where they established the rates and the amount to be paid. The online inventory system, PQ was able to, after they had a delivery, they could check the quantities that they shipped against what showed up in the inventory that Double D had, as well as Double D then would ship out goods from the warehouse to PQ's customers. And so on a pro rata basis, it was very sophisticated. They could calculate how many days 6 million pounds were in the warehouse, and at the end of the month they were invoiced for the amount of goods that were there against the rate that was agreed and using the inventory tracking system. And that's why they moved away from the paper, because there were a lot of inefficiencies and customers didn't want to wait to get the receipts back to try and reconcile what was there. So they came up with the barcode system and a much more sophisticated approach to tracking the goods. Why can't an insurer deny that it has a duty to indemnify and still reserve its right to defend a lawsuit brought in the future? You know, in order to avoid exactly the situation that we have here. Well, I think that the reservation of rights is an option for that, and the flat denial in this instance, if you look at the language that they used when they wrote the denial, it was, we're sorry to inform you, but after our investigation, conclusion of our investigation, your goods were contaminated by the phenol, and therefore the exclusion, exclusion, exclusion applies. Secondly, we found no evidence that you complied with this other portion because you didn't have these right documentation. So absent finding a document that met their standards or finding that there was no pollution event, they got denied twice, you know, the Double D Warehouse retained counsel after it got the first denial. If you look at those denial letters, the first one went to Steve Olson, the second went to Scopolitis, to Kevin Phillips, who was retained specifically to argue about the pollution exclusion and the determination that was made. It was to no avail. They came back and said, we stick with our position that it's the pollution exclusion that applies and your failure to produce the necessary documents that meet Section 2.4 under the policy. So I think in that instance, it falls under Davis' most controlling that it would be futile for them to come back and ask again without having one of the... In fact, the denial says pollution exclusion, then the warehouse receipts, but hey, if you do come up with a warehouse receipt or something that qualifies, we're still denying you because of the pollution exclusion. So the futility of the situation was they knew that the goods had been damaged by being adjacent to the phenol and if the pollution exclusion applied, they had no recourse. Looking at the insuring agreement and the conflict between the two provisions, we also think that the district court erred in not taking that into effect and not even attempting to apply that language because if you did look at that, it started to do the analysis when it looked at Double D's inventory system and it said perhaps there's a chance that they had actually released a warehouse receipt, but then they said it wasn't signed by PQ, end of story. But if you look at it under the insuring clause, there is no requirement that that be signed by PQ. So that's an inherent conflict and an ambiguity that was not addressed by the district court because it had adopted its own definition of a warehouse receipt from the ICC and from Webster's, which required it to be issued by the warehouse and then adopted the other provision. Not the first insuring clause, but the exclusionary language requiring the subsequent signature by PQ. And ultimately, I think Your Honor's point was why would they do this? Why would Double D move away from this? And I think what Double D did was accomplish what the policy really wants, which is that in a loss, a typical loss at a warehouse is it's a fire, flood, storm damage, theft. The goods aren't there, so you need some mechanism to be able to track and identify what was there. There is no evidence that they looked at the substance of the bill of ladings and the inventory system to determine whether or not it accomplished the precise task that these other things are set to accomplish. And we believe that that needs to be reversed and remanded so that they can go back and analyze the true substance and not just the name bill of lading versus a warehouse receipt to determine. The challenge, I understand what you're saying from a practical standpoint, and surely there's nothing in the law intended to be more practical than the Uniform Commercial Code. But we do have the language in the insurance policy that may date from the late 19th century, for all I know, with handwritten warehouse receipts. But what do you think is your best doctrinal theory for avoiding that language in the statute, in the policy? Well, I think the best trial theory on the UCC is that it says may. A warehouse receipt may be issued from a warehouse. It doesn't say it has to be. And then if you read precise language in Section 810.5-7-201A, the actual word is a warehouse receipt may be issued by any warehouse. Now, both Lexington and the District Court then flip that around to say it has to be. No, the requirement comes from the policy, not the statute. Okay, and my argument on the policy is that the insuring agreement, which says, first of all, what the policyholder must prove to get in to make their claim, is Section 1. And Section 1 does not require that a warehouse receipt has to be signed by PQ Corporation. It simply says that it can be issued by DD or on DD's behalf. And our trial argument will be that the online inventory system is issued by DD ultimately after it's inventoried the goods. I'm not trying to be coy about this. I thought, in essence, the argument is that the insurer accepted this in terms of course of dealing because of the somewhat ambiguous notations in the original application and the fact that that's how you did business and that that was disclosed, right? Correct. And if it's not course of dealing, then it's some form of waiver. Is that right? Okay. You asked me, I think, what was my best... Doctrinal. Yeah, and so I'm also going to argue that as well with the notification this is the course of dealing, it was revealed, and at best they would have needed to raise some questions as to what that notation meant. Would any losses, given the way DD operated, would any casualties losses to goods in their custody have been covered? Under the Lexington's interpretation right now, no. For fire, floods, anything? Nothing. If the first question that their loss adjuster is going to ask is, show me your warehouse receipt, and the answer would be the same from Mr. Olson, we don't use those anymore. Here's what I've got. This is the list of all the inventory that was here. What do we make of the fact, though, that apparently Mr. Olson was not even aware of the warehouse receipt requirement in the policy? I don't have a problem with that because I don't think that his knowledge of that obviously would have helped if his broker had explained it, but the policy wasn't built with that as a condition precedent. These are disjunctive. He's got three options to get coverage here, and if he had done any one of them under that exclusion... But he didn't do any of them, right? He didn't do any of them to the letter of what Lexington says. We would argue that he did, and that his course of dealings established a very clear understanding of what the goods were, accomplished exactly what that goal is. I mean, this provision is here to prevent fraud. It's not here to deny claims where the goods are clearly there, and there's no question as to what was damaged and what wasn't damaged. Thank you. Want to save some of your time? I would like to save some of my time. Thank you. Mr. Canaris, good morning. Good morning. This is not going to work that well. Do you... I'm all set. Okay. You've turned it into your desk. Yeah. I like to have papers spread out all over. Let me start by returning to the undisputed facts in this case. This is a contract that was entered into between Double D and Lexington and not PQ. And Mr. Olson made clear that there was no ambiguity in the agreement. He testified that he knew what a warehouse receipt was. He said it was a receipt issued by a person engaged in the business of storing goods for hire. It's issued by the warehouseman. He also said that he knows what a storage agreement was, and he said that he did use storage agreements with certain customers, just not with PQ. Also, he said he knows what a bill of lading is, and he said a bill of lading is evidence of the shipment of goods by a person engaged in transporting the business. A bill of lading is not a warehouse receipt. The owner of the business knew that when he entered into the insurance... What is the definition of a warehouse receipt, and where does whatever that definition has come from? It's not defined in the policy, but it's based on ordinary plain meaning. Ordinary? Which is? Which is a receipt of goods by the warehouse that's issued by them to evidence the storing of the goods for hire. It has the terms of the agreement in there. The UCC says that it can take any form, but it has the terms. And the underwriters indicated what they were really concerned about is they want to see what those terms are. Why? Because almost every warehouse receipt or storage agreement has a limitation of liability, a price per pound. Your policy doesn't require that, though, does it? It doesn't require a limitation. It just requires a warehouse receipt issued by Double D signed by the person who's depositing their goods at the time they deposited the goods. Or a storage agreement. Why does it need to be signed by the customer? Because it becomes a contract then, right? They're acknowledging that these are the goods that were stored in. It's a contract whether the signature is on there or not, correct? No, but you need two parties. Of course you need two parties to the contract, but one party's performance is the delivery of the goods and the agreement to pay, right? Right. But you need PQs because there's express terms in the warehouse receipt, as in the storage agreement, that lay out what the duties are of the warehouseman and also exculpation clause for no consequential damages. So the person depositing the goods needs to acknowledge that. That's why that's required. None of that is in your policy. None of that about limitations of liability or exculpation, right? No, but it says a warehouse receipt, and that's what's typically in a warehouse receipt. Typically? Yes. Okay. Is it typical to have the warehouse receipt signed by the customer? Yes. What evidence do we have of that? From the underwriters that are in the business of underwriting this type of coverage and also although Mr. Olson did not testify as to what was industry customer practice on warehouse. He just talked about what his business did. Why does Lexington care about the difference between the bills of lading and online inventory system on the one hand and a signed warehouse receipt on the other? Because the internal inventory system of the insured is not a contract. And a bill of lading is not a contract either. The bill of lading, I'm sorry, it is a contract, but it's only a contract between PQ and the shipper. So why does that difference matter if you have a reliable indicator of what Well, you've got a statute of frauds issue, right? You have to have a signed writing. These are goods that are far more than the minimum amount. That's why you need a written agreement, either a receipt or a storage agreement, signed by the warehouse and PQ, or issued by the warehouse, signed by PQ. I mean, there would be an oral contract at best. And in underwriting this risk, Lexington wants to see proof that the insured is doing things in a commercially reasonable way, and that includes either using a warehouse receipt, a storage agreement, or they issue a rate quotation with the terms attached. That's sufficient under the definition as long as they're acknowledged and signed by PQ. Do you have reason to think that Double D issued warehouse receipts to some customers, but just not to PQ? We know from Mr. Olson's testimony that they did not issue warehouse receipts. We also know from his testimony that he did enter into storage agreements with customers. And in fact, when he alleged in his complaint that he filed on the lack of indemnity, he alleged that there was a storage contract in agreement. And that was before PQ intervened. I mean, shouldn't the district court have considered Double D and Lexington's course of dealings before or instead of considering the usage in the trade of the term warehouse receipt? There's no evidence, of course, of dealing, Your Honor. The only evidence that the plaintiff offers is an application. An application is not even an offer. There was no contract at the time. An application is like a request for proposal. Here's the underwriting information that we're giving you. Included in that underwriting information, an answer to the question was, please attach a warehouse receipt. They said we use contract, and then separately it said, misspelled, giving them better for the doubt, bill of lading for delivery of goods. And then there was terms and conditions that were attached. That's not even an offer. What happened is Lexington then offered and issued a quote for coverage based on the insurance contract terms, and Double D accepted it. So this is the only issue, of course, in dealing. From 2008 onward, the insurance contract terms made clear what Lexington was willing to write coverage for. And maybe that's part of the problem here with the district court raising the waiver issue on its own. Well, did you waive waiver by failing to object to the evidence that was offered by a PQ in support of waiver in Estoppel, and by introducing evidence to refute those claims? Well, first on the waiver claim, let's be clear. The district court judge raised that on his own, and it was not pled, and PQ didn't argue it in his papers. Does it have to be pled? Yes, to put us on notice. Why? Because that is a theory of why they're trying to exculpate themselves from relying on the contract. They're just alleging breach of contract. Right. They don't need to plead waiver. And you cited to us Illinois pleading requirements, which do not apply at all in federal court. Your Honor, I confess that I've looked at all the cases. I'm not raising an argument below and then raising it for the first time on appeal, and the court can decide pretty much what they want to do. That's true. I can't make heads or tails out of the case. But you can agree that there's no need to plead this? I do. I do. Thank you. In federal court, yes, I do. But, again, I think that it's important to note that the application included the standard terms attached, and it had what typically would be in a warehouse receipt, limitation of liability, defined the scope of duty owed, and also expressly limited consequential damages. And then the court relied on the Burke case, which says, and that's the law, that you need an intentional relinquishment of a known right. There was no intentional relinquishment of a known right. In fact, after it got the application, Lexington made an offer. It issued a quote for coverage based on these terms on what is required. Double D accepted it, and the policy was issued. How can there be an intentional relinquishment of a known right? In fact, every case that's been cited about waiver is after the contract was issued, after there was a loss, there was conduct on the part of the insurer. For example, the one case that they rely upon, where the insurer's representative said, we're granting coverage despite the fact that there isn't. And then they tried to retract that, and the court said that was an intentional relinquishment. The other case that they rely upon was a premium payment, and the premium payment was sent to the broker at the broker's request. The policyholder got a notice of cancellation from the insurance company, and he called up his broker, and the broker said, don't worry, I'll take care of it. I'm going to send in the check. And he didn't, and the court found them bound by the agent's statement. None of those facts are present. None of those facts can exist here because there was no intentional relinquishment of a known right. On the estoppel issue, and I just want to address it briefly, that was not pled. Again, it was not raised as an argument, and the district court did not address it separately. The first time we're seeing it is on appeal, and we believe that it should not be considered by the court. But if the court were to consider it, there's still not an estoppel because there has been no evidence of any misleading statement by Lexington about what its policy covered. All of the cases on estoppel are when the insurance company, after the policy has been issued and there's a loss, or during the issuance of the policy, said that we're going to do something different. If they had any action whatsoever, it probably lied in alleging reformation if they said that these terms should not have been here. But that wasn't pled. It can't exist because there was no mutual mistake of fact. They're trying to use an application set before there's even been an offer and acceptance on the terms of an insurance to create an estoppel, of course a dealing argument, and a waiver. And respectfully, Your Honor, that's not evidence or sufficient to create an issue of fact. On the issue of the denial of coverage, Mr. Canaris, I'm frankly troubled by your position and the district court's analysis of that. What language do you think it would take to conclusively deny coverage? If it didn't have the wording in there that if you have any information that comes to light or that you want us to consider, that we will consider it provided to us. So you can put just an open-ended, we're willing to keep talking without indicating what it would take. It would have to be, in essence, our ears and minds are closed at this point. Well, the Malachur case that was decided by Judge Amy St. Eve Below, that language appeared in the denial letter. I don't think that it did, did it? Was it the same language? I thought the Malachur case was about if you get sued. It said if there's a lawsuit for the lawsuit. Was there any such language here? No, ours is broader, Your Honor. It's broader than lawsuits because it says any information. It didn't say just lawsuit. And what information would we have looked at in the complaint? If the complaint, because the duty to defend doesn't arise until an actual lawsuit is filed, we would have looked at the complaint. And if the complaint said. . . Then why didn't you say that in the letter? We said anything. We said it broader than lawsuit, Your Honor. It wasn't just the lawsuit. We said anything because we didn't want to limit it to just the lawsuit. That's creative. Stranger things have happened. The storage agreement could have been in the possession of PQ and not BB. They might not have had a copy. I mean, there's information and documents that can come to light down the road. PQ was not a party to the insurance contract. Lexington couldn't force PQ to do anything. They didn't have the obligations that Double D did under the agreement. So I appreciate what the Court is saying, but I think the Malachur case by decided below is directly on point. Let me put it this way. What support from. . . This is a question of Illinois state law. What indications from Illinois courts do you have that your letter was not an effective denial of coverage? Only the cases cited by the Court in Malachur. Thank you. I wanted to. . . Let me just real quick. Sorry. What was the role or meaning of the language written on the contract that said, quote, contract deliveries by bill laden? You know, that's L-A-D-E-N. It was an error. That was in the application. That's not in the insurance contract. So when Judge Saw looked at that, I mean, to be an intentional relinquishment of a known right, he said that at best this language is ambiguous because it had contract and then delivery of goods. How could anybody have intentionally waived a right based on that language? No reasonable mind could differ on that. That's what the district court said, and we agree with that. No reasonable mind could say that that statement, those two statements side by side in an application, well before there's even been a contract or acceptance or an offer made constitutes a waiver of the terms of the policy. I think the last issue that we wanted to address with the court is that this bill of lading form is in the record, and it's clear that it's not a warehouse receipt or a storage agreement. It's not signed by Double D. It was not issued by Double D. Double D Express, and we need to be very clear, is not Double D. It's a different entity. It's in the record. They're a trucking firm that does deliveries. So it was not acknowledged or countersigned by Double D in any way, as was suggested in the argument. And then the other thing that I wanted to point out, Your Honor, is the district court correctly decided the Section 155 claim. There was a bona fide dispute between the parties. The court concluded that since there was no coverage, there couldn't be a claim. The fact that the district court, based on the facts that were undisputed  warrants this court affirming on the Section 155 claim. In the end, Your Honor, I think that, Your Honors, this was an agreement that was entered into between Lexington and Double D. Mr. Olson understood what the terms were, warehouse receipt, bill of lading. He does that in his ordinary course of business all the time. He knew what a storage contract was. PQ is an assinee that came here, and they're bound by what the policyholder, what the contract was that was entered into. They have no greater rights. They cannot create an ambiguity where none exists and where the policyholder himself, the owner of the business, saw no ambiguity. And for those reasons, Your Honor, we believe that this decision below should be affirmed. If there's no more questions. Thank you. You have three minutes. I will address the first issue that was news to me, that the application is not part of the policy. If you look at the application document, 20-18, page 178, it says, in consideration of your payment and the required premium, in reliance upon the declarations and application for this policy and subject to the applicable limits and other terms and conditions, we provide this coverage. In almost all circumstances, the application is a material part of the insurance policy. But it's something the insurer can rely upon, right? Well, it's often, in my experience of representing policyholders, it's used as a means of denying coverage. Right, because of misrepresentation or omission and so on. Exactly. But that doesn't mean that the application can modify the policy, does it? In terms of expanding the obligation to insure. Agreed. But it informs the underwriter. And just like the council spent a lot of time talking about the one page that was attached, that was allegedly attached to the application, and yet they rely on that in the convoluted analysis to ultimately say that that was evidence of the contract that was ultimately going to be used, which had this limitation of liability. But you accurately pointed out that that was just one mechanism. It wasn't a requirement of the policy. So they were able to rely on that one sheet, and it was given a great deal of weight by the district court. But the notation from regarding the custom and practice of business, even though they said it was at least ambiguous, didn't rise to the level of him considering the custom and practices of Double D Warehouse and the way in which they actually operated with the use of the bills of lading. In conclusion, we believe that under any theory of this case, there's at least material issues of fact that should have been resolved by the district court in looking at the ambiguities in the contract, expressed language in the contract, and the extrinsic evidence. We respectfully request that this court reverse and remand with instruction to the district court. All right. Thank you so much. And the case will be taken under advisement.